## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JARED M. EDGERTON,**

      **Plaintiff,**

     **vs.**                           **Civ. No. 14-725  KK**

**SOCIAL SECURITY ADMINISTRATION,**
**Carolyn W. Colvin, Acting Commissioner,**

      **Defendant.**

### MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** is before the Court on Plaintiff's Motion to Reverse and Remand for Rehearing, With Supporting Memorandum ("Motion"), filed on March 30, 2015.  (Doc. 19.) The Commissioner of Social Security ("Commissioner") filed a Response on July 30, 2015 (Doc. 25), and Plaintiff filed a Reply on August 10, 2015.  (Doc. 26.)  Having meticulously reviewed the entire record and being fully advised in the premises, the Court finds the Motion is not well taken and should be **DENIED.**

### I.  Standard of Review

    Judicial review in a Social Security appeal is limited in scope by 42 U.S.C. § 405(g) to two inquiries: first, whether substantial evidence supports the Commissioner's final decision[2]; and second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).   If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned conducting any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 12, 13.)

[2]  A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

decision stands and the plaintiff is not entitled to relief.  *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).  Conversely, "[t]he failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal."  *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted).  Courts must meticulously examine the entire record, but may neither reweigh the evidence nor substitute their judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Id.*  While the court may not reweigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II.  Applicable Law and Sequential Evaluation Process

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). To qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of at least twelve months, which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261. If the claimant cannot show that his impairment meets or equals a Listing, but he proves that he is unable to perform his "past relevant work," the burden of proof then shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity ("RFC"), age, education, and work experience. *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). "This is true

---

[3] 20 C.F.R. pt. 404, subpt. P. app. 1.

3

despite the presence of counsel." *Henrie*, 13 F.3d at 361.  "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).  This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination. *Madrid*, 447 F.3d at 791-92.  The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167.

### III.  <u>Background and Procedural Record</u>

Plaintiff Jared M. Edgerton ("Mr. Edgerton") was born on December 4, 1981.  (Tr. 178, 183.[4])  Mr. Edgerton completed two years of community college in 2002.  (Doc. 217.) Mr. Edgerton's work history for the past fifteen years included work as a painter/yard hand for an oilfield supply company, a delivery driver/laborer for a retail rental store, and a painter's helper for an auto body shop.  (Tr. 217, 222.)

On April 6, 2011, Mr. Edgerton protectively filed[5] an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401, and concurrently filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1382(a)(3).[6]  (Tr. 178-82, 183-89.)  Mr. Edgerton alleged a disability onset date of March 1, 2011, because of "1 inch of [his] right heel . . . missing,

---

[4] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 14) that was lodged with the Court on October 17, 2014.

[5] Protective Filing Status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security Disability Benefits.  The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application.  *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345.

[6] Mr. Edgerton previously filed concurrent applications for DIB and SSI on August 4, 2010.  (Tr. 74.)  The Social Security Administration denied Mr. Edgerton's applications on November 12, 2010.  (*Id.*)

arthritis in [his] heel, hyatial [sic] hernia, [and] asthma."[7]  (Tr. 216.)  Mr. Edgerton has not

engaged in substantial gainful activity since his alleged disability onset date.[8]  (Tr. 17.)

Mr. Edgerton's date of last insured was June 30, 2013.[9]  (Tr. 15, 212.)

 Mr. Edgerton's applications were initially denied on November 4, 2011.  (Tr. 100-04.)

At reconsideration on January 6, 2012, Mr. Edgerton reported no new or worsening conditions.

(Tr. 78, 91, 252.)  Mr. Edgerton's applications were denied again at reconsideration on April 19,

2012.  (Tr. 73-84, 86-97.)  On June 22, 2012, Mr. Edgerton requested a hearing before an

Administrative Law Judge ("ALJ"), and the ALJ conducted a hearing on October 19, 2012.

(Tr. 30-68, 114-16.)  Mr. Edgerton appeared in person at the hearing with his attorney Ronald

Harris.  (*Id.*)  The ALJ took testimony from Mr. Edgerton (Tr. 38-62) and an impartial vocational

expert ("VE"), Thomas Greiner.[10] (Tr. 63-65.)

 On January 25, 2013, the ALJ issued an unfavorable decision.  (Tr. 12-25.)  At step one,

she found that, although Mr. Edgerton worked after the application date, his work activity did not

rise to the level of substantial gainful activity.  (Tr. 17.)  Because Mr. Edgerton had not engaged

in substantial gainful activity since February 26, 2008, the alleged onset date, the ALJ proceeded

to step two and found that Mr. Edgerton suffered from the following severe impairment:

"history of calcaneal fracture, status post right calcaneal osteotomy; post-traumatic arthritis; and

---

[7] On October 19, 2012, at the administrative hearing, Attorney Ronald Harris requested to amend the alleged onset date from March 1, 2011, to February 26, 2008.  (Tr. 15, 26.)  Attorney Harris also requested that Mr. Edgerton's most immediate prior applications be reopened.  (Tr. 35.)  (*See* the Commissioner's Hearings, Appeals and Litigation Law Manual ("HALLEX") 1-2-9-20, Computing the Time Periods for Reopening) (explaining that reopening is an issue if the claimant alleges an onset of disability during a previously adjudicated time period)).

[8] Mr. Edgerton had earnings in 2009; however, the ALJ determined they fell short of demonstrating that he performed substantial gainful activity.  (Tr. 17.)

[9] To receive benefits, Mr. Edgerton must show he was disabled prior to his date of last insured.  *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

[10] Mr. Greiner testified regarding Mr. Edgerton's work history.  (Tr. 63-65.)

asthma." (*Id.*)  The ALJ found Mr. Edgerton's anxiety to be non-severe.[11]  (Tr. 18.)  At step

three, the ALJ concluded that Mr. Edgerton did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1. (Tr. 18.)

Because she found that Mr. Edgerton's impairment did not meet a Listing, the ALJ went

on to assess Mr. Edgerton's RFC at step four.  The ALJ stated that

> [a]fter careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform sedentary work as defined in 20 CFR
> 404.1567(a) and 416.967(a) except he can lift and carry 15 pounds occasionally,
> he can push and pull commensurate with his ability to lift and carry, he can sit at
> least six hours in an eight-hour workday, he can stand and walk three hours in an
> eight-hour workday, he can occasionally climb ramps and stairs, and he can never
> climb ladders, ropes, or scaffolds.

(Tr. 19.)  The ALJ concluded that Mr. Edgerton was unable to perform his past relevant work

and proceeded to step five.  (Tr. 24.)  At step five, the ALJ applied the Medical-Vocational

Guidelines as a framework and determined that Mr. Edgerton was not disabled.  (Tr. 24-25.)

On June 27, 2014, the Appeals Council issued its decision denying Mr. Edgerton's

request for review and upholding the ALJ's final decision. (Tr. 1-3.)  In reviewing his case, the

Appeals Council considered a letter submitted by Mr. Harris summarizing the arguments before

the Appeals Council.  (Tr. 5, 260-62.)  On August 15, 2014, Mr. Edgerton timely filed the instant

action seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

---

[11] Mr. Edgerton's applications did not list anxiety as a cause of his disability.  (*See* Tr. 216, 252.)  However, the ALJ noted that Mr. Edgerton had exhibited "some slight anxiety due to his physical condition and required the use of Xanax and Ativan for a short period."  (Tr. 18.)  As such, the issue was properly before the ALJ.  *See Hawkins v. Chater*, 113 F.3d 1162, 1164, n. 2 (10th Cir. 1997) (citing *Carter v. Chater*, 73 F.3d 1019, 1021-22 (10th Cir. 1996)).

## IV.  Summary of Medical History

The Court has carefully reviewed and considered the entire record.  The discussion of Mr. Edgerton's medical history that follows captures pertinent medical information presented to the ALJ and relevant to the issues Mr. Edgerton has raised.

On February 26, 2008, Mr. Edgerton was working as a painter/yard hand for an oilfield supply company in Bloomfield, New Mexico. (Tr. 41, 217.)  He was perched on a ladder painting a drip tank when he fell 15-20 feet and sustained a right calcaneal (heel bone) fracture.[12] (Tr. 482, 487.)

### A.      Lawrence Ward, DPM

On March 3, 2008, Lawrence Ward, DPM ("Dr. Ward") of Orthopedic Associates in Farmington, New Mexico, openly reduced Mr. Edgerton's fracture and placed two screws for internal fixation.  (Tr. 484-85.)  Dr. Ward followed Mr. Edgerton post-operatively for several months, and on August 28, 2008, Dr. Ward removed the heel screws because Mr. Edgerton complained of ongoing pain associated with the internal hardware.  (Tr. 450.)  Mr. Edgerton participated in physical therapy from October 28, 2008 to December 18, 2008, and reported to Dr. Ward on November 25, 2008, that physical therapy helped him tremendously.  (Tr. 426-42, 532.)

Mr. Edgerton saw Dr. Ward on March 13, 2009, and reported ongoing heel pain. (Tr. 424.)  Dr. Ward administered a lidocaine injection into Mr. Edgerton's sinus tarsi, and noted that if Mr. Edgerton's pain were reduced by the injection that a subtalar fusion could be justified. (*Id.*)  Mr. Edgerton last saw Dr. Ward on March 30, 2009, and complained of right ankle/foot

---

[12] Mr. Edgerton submitted a workers' compensation claim regarding this injury.  (Tr. 48.)  On March 20, 2012, Camille Rivera, M.D., of Four Corners Muscle and Nerve Center, determined that Mr. Edgerton had a 26% lower extremity impairment and a 10% whole body impairment.  (Tr. 704-06.)  Mr. Edgerton receives monthly workers' compensation benefits of $242.00.  (Tr. 49.)

pain "on inversion and eversion."  (Tr. 558.)  Mr. Edgerton reported that the previous lidocaine injection had helped very little.  (*Id.*)  Dr. Ward reviewed x-rays from March 13, 2009, and noted appropriate alignment of the subtalar joint.  (*Id.*)  Dr. Ward questioned the amount of pain Mr. Edgerton described, but noted that, if it were so, a subtalar joint fusion would be appropriate. (*Id.*)  Mr. Edgerton planned to seek a second opinion.  (*Id.*)

On March 30, 2009, Dr. Ward prepared a "To Whom It May Concern" form indicating that Mr. Edgerton "[m]ay return to light duty [work]," and restricted Mr. Edgerton to "limited walking" and that a "sit down job [was] preferred."  (Tr. 425.)  On April 6, 2009, Dr. Ward prepared a second "To Whom It May Concern" form indicating that Mr. Edgerton "[m]ay return to light duty [work]," and restricted Mr. Edgerton to "no sweeping, standing only 30 min[utes] at a time, [and] cane use at all times."  (Tr. 646.)  On November 11, 2009, Dr. Ward completed a Workers' Compensation Administration "Form Letter to Health Care Providers" and represented that Mr. Edgerton could return to his former work with no restrictions.  (Tr. 499.)

>    **B.**     **Durango Orthopedics Spine Colorado**

On January 14, 2010, Mr. Edgerton saw orthopedic surgeon Kim L. Furry, M.D., of Durango Orthopedics Spine Colorado, seeking a second opinion regarding a subtalar fusion. (Tr. 555-57.)  Mr. Edgerton reported that he had some pain relief with [lidocaine] injections administered by Dr. Ward.  (*Id.*)  Dr. Furry physically examined Mr. Edgerton and reviewed the medical records he provided.  (*Id.*)  Dr. Furry did not recommend surgical intervention, but instead recommended further diagnostic evaluation of the subtalar joint, physical therapy, and that Mr. Edgerton wear "rocker bottom" shoes to facilitate walking heel to toe.  (Tr. 263, 557) Dr. Furry questioned whether Mr. Edgerton would "ever really be pain free."  (Tr. 557.)

On October 14, 2010, Mr. Edgerton returned to Durango Orthopedics Spine Colorado and saw Dr. Furry and Douglas J. Phelps, PA-C.  (Tr. 263)  Mr. Edgerton reported continued generalized ankle pain, but that he had not followed up on Dr. Furry's previous recommendations.  (*Id.*)  Mr. Edgerton stated he hoped to have some type of surgical procedure.  (*Id.*)  Dr. Furry recommended that Mr. Edgerton see a foot and ankle specialist, and that it would benefit Mr. Edgerton to have a diagnostic injection done by a foot and ankle surgeon.  (*Id.*)  Dr. Furry recommended again that Mr. Edgerton wear rocker bottom shoes and pursue physical therapy, and had no other treatment recommendations for him at that time.  (*Id.*)

### C.   Independent Medical Evaluation

On November 29, 2010, Anthony Reeve, M.D., and Zachary M. Haas, DPM, independently evaluated Mr. Edgerton as part of his workers' compensation claim.  (Tr. 501-28.) They agreed that Mr. Edgerton was not at maximum medical improvement at that time and that further treatment might be necessary, including surgical intervention.   (Tr. 512.)    They determined, however, based on their interview with Mr. Edgerton and review of the available medical records, that Mr. Edgerton was capable of sedentary work.  (*Id.*)  They recommended pain management that included therapy for "desensitization of the sural nerve and aggressive range-of-motion of the subtalar joint," and an ankle foot orthotic.  (*Id.*)  Mr. Edgerton responded favorably with "75% pain relief with an isolated subtalar joint injection."  (*Id.*)  They noted that if Mr. Edgerton were to have additional surgery, they anticipated he would reach maximum medical improvement six months postoperatively.  (*Id.*)

### D.   Benjamin S. Wehrli, DPM

On February 28, 2011, Mr. Edgerton began care with Benjamin S. Wehrli, DPM ("Dr. Wehrli"), of Animas Foot and Ankle, PC, in Durango, Colorado, for ongoing right

foot/ankle pain.  (Tr. 881-82.)  At the initial visit, Dr. Wehrli administered a steroid injection into Mr. Edgerton's right subtalar joint, and after five minutes Mr. Edgerton reported he was pain free.  (Tr. 882.)  On that basis, Dr. Wehrli recommended a subtalar joint fusion and calcaneus re-alignment, but indicated that Mr. Edgerton would have to quit smoking for a period of six weeks before he could be considered a candidate for the procedure.  (*Id*.)  Dr. Wehrli recommended that Mr. Edgerton use Motrin and to ice and elevate as needed for pain.  (*Id*.)  On May 9, 2011, Dr. Wehrli administered a second steroid injection.  (Tr. 871.)  Mr. Edgerton was still smoking and Dr. Wehrli advised him he would not proceed with surgery unless Mr. Edgerton was smoke and nicotine free for one month prior to surgery.  (*Id*.)

On June 23, 2011, Dr. Wehrli admitted Mr. Edgerton to Animas Surgical Hospital in Durango, Colorado, and performed a right subtalar fusion, calcaneal osteotomy, and lateral neurectomy.  (Tr. 374-76.)   Dr. Wehrli discharged Mr. Edgerton on June 25, 2011, with instructions, *inter alia*, of strict non-weightbearing, ice on affected extremity for fifteen minutes every hour, and to elevate his right leg with two pillows.  (Tr. 411.)  On July 5, 2011, Mr. Edgerton saw Dr. Wehrli post-operatively and reported pain and noncompliance with wearing the CAM (controlled ankle movement) boot.  (Tr. 842.)  Radiographic studies showed the hardware intact and no signs of loosening or failure.  (*Id*.)  Dr. Wehrli ordered Mr. Edgerton to, *inter alia*, remain strict non-weightbearing, and to ice and elevate his right leg.  (*Id.*)

Mr. Edgerton experienced a post-operative infection requiring two incision and drainage ("I&D") procedures on July 26, 2011, and July 28, 2011.  (Tr. 291-92, 300-01.)  Dr. Wehrli's post-operative orders for both I&D procedures included, *inter alia*, that Mr. Edgerton elevate his right leg. (Tr. 297, 814.)  On August 2, 2011, Dr. Wehrli saw Mr. Edgerton post-operatively and noted that Mr. Edgerton should continue to ice and elevate his right leg as part of his post-

operative orders.   (Tr. 651-52.)   On August 17, 2011, Dr. Wehrli debrided Mr. Edgerton's post-operative wound infection and applied an Apligraf[13] to assist in healing the wound.   (Tr. 276-77.)  Dr. Wehrli's post-operative instructions included, *inter alia*, that Mr. Edgerton ice the affected extremity every hour while awake, and elevate the affected extremity with two pillows. (Tr. 282.)

On September 20, 2011, Dr. Wehrli prepared a prescription note for physical therapy for Mr. Edgerton three times per week for six weeks, and prepared a second prescription note that stated, "Jared may return to work and can weight bear as tolerated for no more than 3 hours a day and may not lift more than 15 lbs."  (Tr. 805.)  On November 1, 2011, Dr. Wehrli renewed Mr. Edgerton's prescription for physical therapy,[14] and released Mr. Edgerton to work "weight bearing as tolerated using crutches."  (Tr. 666, 730.)  On November 29, 2011, Dr. Wehrli saw Mr. Edgerton and noted that he was recovering well, but more slowly than anticipated.[15] (Tr. 728-29.)  Dr. Wehrli gave Mr. Edgerton posterior muscle group stretches, instructed him to weight bear as tolerated in a CAM boot and without crutches, and to take Tylenol and to ice and elevate as needed for pain.  (Tr. 729.)  Dr. Wehrli prepared a prescription note that same date that stated, "light duty, no lifting, no weight bearing for longer than ½ hour."  (Tr. 653.)   On January 17, 2012, Dr. Wehrli instructed Mr. Edgerton to weight bear as tolerated in "good

---

[13]   Apligraf® is a living cell based product used to heal chronic leg and foot ulcers. http://www.apligraf.com/patient/what_is_apligraf/what_is_apligraf.html.

[14] Mr. Edgerton began physical therapy on October 3, 2011, at Physical Therapy & Sports Medicine of Northern New Mexico, with certified athletic trainer Roger R. Collins, and physical therapist Sid Mosiman.  (Tr. 664-65.) Mr. Edgerton attended physical therapy from October 3, 2011, through February 8, 2012.  (Tr. 647- 48, 650, 654-58, 660-62, 664-65, 707, 723-27, 735-39, 745, 749-51, 763, 767.)   Physical therapy notes from February 8, 2012, Mr. Edgerton's final session, indicated that ongoing physical therapy may be beneficial, but that Mr. Edgerton was definitely functional with all of his ADLs (activities of daily living).  (Tr. 707.)

[15] Physical therapy records dated November 21, 2011, indicated that Mr. Edgerton reported that he had slipped on gravel and strained his right ankle.  (Tr. 749.)

supportive shoe gear," and to take Tylenol and to ice and elevate as needed for pain.  (Tr. 721-22.)  On January 19, 2012, Dr. Wehrli prepared a prescription note that stated, "Jared is at MMI for his calcaneal fracture."  (Tr. 747.)  On January 26, 2012, Dr. Wehrli prepared a prescription note that stated Mr. Edgerton could "[r]eturn to work for full duty – No Restrictions."  (Tr. 734.)

### E.    Physical Residual Functional Capacity Assessment – Tom Dees, M.D.

On November 3, 2011, State agency non-examining consultant Tom Dees, M.D., prepared a Physical Residual Functional Capacity Assessment.  (Tr. 412-17.)  Dr. Dees assessed that Mr. Edgerton could perform light duty work with occasional postural limitations, and that he had limitations in pushing of foot controls in his right lower extremity.  (Tr. 413-14.)  Dr. Dees commented on Mr. Edgerton's surgical and post-operative history, but concluded that "[c]laimant's condition is expected to improve within the next few months."  (Tr. 416.)

### F.    Functional Capacity Assessment – Rakita & Tomsie Physical Therapy

On February 29, 2012, Mr. Edgerton was referred to Rakita & Tomsie Physical Therapy for a functional capacity evaluation.  (Tr. 711-20.)  Physical therapist Stephen Stockhausen, DPT, evaluated Mr. Edgerton.  (*Id*.)  Mr. Edgerton's complaints included "[c]onstant ankle pain along the joint line, cramps to medial arch, chronic swelling, and [his] ankle 'locks' when walking."  (Tr. 711.)  Mr. Edgerton reported that he felt better "sitting, in the daytime, with ice, occasionally heat, and elevating the foot."  (*Id*.)  Dr. Stockhausen's evaluation included, but was not limited to, cardiovascular, pulse oximetry measures, activity tolerance, posture, flexibility, reflexes, strength, leg and abdominal testing, palpation, joint integrity, inclinometry, goniometry, static testing, dynamic lifting, and endurance projections.  (Tr. 711-20.)  Dr. Stockhausen concluded that Mr. Edgerton qualified at a light physical demand classification and that he could safely lift sixteen pounds occasionally, eight pounds frequently, and three pounds constantly.

(Tr. 720.)   Dr. Stockhausen recommended physical/occupational therapy, a psychological evaluation, and vocational rehabilitation.  (Tr. 719.)

### G.   Disability Determination Examination – Robert Ryan Johnson, D.O.

On April 7, 2012, State agency examining consultant Robert Ryan Johnson, D.O., examined Mr. Edgerton to assist in determining disability.  (Tr. 418-421.)  Dr. Johnson reviewed Mr. Edgerton medical history and performed a physical examination.  (*Id*.)  Mr. Edgerton reported he could stand for thirty minutes at one time; could walk half a block on level ground; could sit for one hour; and could lift no more than twenty pounds.  (Tr. 419.)  Dr. Johnson concluded that Mr. Edgerton

> does appear to have some reduction in functional capacity as a result of his heel as evidenced by increased callous formation on the left and not right.  Somewhat difficult with physical exam which suggest[s] patient may have difficulty with prolonged standing or walking.  No difficulty with sitting would be anticipated. Possible difficulty also with climbing ladders.

(Tr. 421.)

## V.  Analysis

Mr. Edgerton makes two arguments in support of reversing and remanding his case, as follows: (1) the ALJ's RFC assessment failed to consider the impact of Mr. Edgerton's need to continuously elevate his leg while sitting; and (2) the ALJ failed to obtain vocational expert testimony on how that postural limitation would affect Mr. Edgerton's occupational base.

### A.   RFC Assessment

Mr. Edgerton first argues that the ALJ's RFC assessment failed to consider the impact of his need to continuously elevate his leg while sitting.  (Doc. 19 at 6.)  Mr. Edgerton cites to three separate records by his treating physician, Dr. Wehrli, in which he asserts Dr. Wehrli ordered him to keep his damaged foot iced and elevated.  (*Id.* at 6-7.)  Although Mr. Edgerton concedes

that Dr. Wehrli never imposed elevating his foot as a functional "restriction," he contends it is nonetheless a self-imposed limitation based on Dr. Wehrli's medically prescribed remedy. (Doc. 26 at 2.)  Because the ALJ gave Dr. Wehrli controlling weight, Mr. Edgerton argues that the ALJ should not have ignored this evidence.  (Doc. 19 at 7.)  Mr. Edgerton further asserts that he reported to his physical therapist that elevating his leg provided relief from pain, and testified at the administrative hearing that he constantly elevates his leg for pain relief.  (*Id.*)  The Commissioner contends the ALJ considered and accounted for all of Mr. Edgerton's credible limitations and based her RFC assessment on those limitations.  (Doc. 25 at 6.)  The Commissioner further contends that the medical evidence in this case does not support a functional restriction that Mr. Edgerton must keep his foot elevated while sitting.  (*Id*.)  The Court agrees.

Assessing a claimant's residual functional capacity is an administrative determination left solely to the Commissioner.  20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level or at the Appeals Council review level, the administrative law judge or the administrative appeals judge at the Appeals Council . . . is responsible for assessing your residual functional capacity."); *see also* SSR 96-5p, 1996 WL 374183, at *2 (stating that some issues are administrative findings, such as an individual's RFC).  In assessing a claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, and review all of the evidence in the record.  *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *see* 20 C.F.R. § 404.1545(a)(2) and (3).  The ALJ must consider and address medical source opinions and must always give good reasons for the weight accorded to a treating physician's opinion.  20 C.F.R. § 404.1527(c)(2); SSR 96-8p, 1996 WL 374184, at *7.  If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the

opinion was not adopted.  SSR 96-8p, 1996 WL 374184 at *7.  Most importantly, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."  *Wells*, 727 F.3d at 1065 (quoting SSR 96-8p, 1996 WL 374184, at *7).  When the ALJ fails to provide a narrative discussion describing how the evidence supports each conclusion, citing to specific medical facts and nonmedical evidence, the court will conclude that her RFC conclusions are not supported by substantial evidence.  *See Southard v. Barnhart*, 72 F. App'x 781, 784-85 (10th Cir. 2003).  The ALJ's decision must be sufficiently articulated so that it is capable of meaningful review.  *See Spicer v. Barnhart*, 64 F. App'x 173, 177-78 (10th Cir. 2003).

The ALJ's RFC assessment is supported by substantial evidence.  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  Here, the ALJ's RFC assessment included an organized and thorough narrative of Mr. Edgerton's medical history, radiologic findings, surgical procedures and post-operative complications, medical source statements and recommendations, physical therapy notes, functional assessments and evaluations, consultative evaluations, lay evidence, and Mr. Edgerton's hearing testimony.  (Tr. 20-23.)  The ALJ explicitly accorded controlling weight to Mr. Edgerton's treating physician, Dr. Wehrli, explaining that Dr. Wehrli performed Mr. Edgerton's osteotomy and was in the best position to know Mr. Edgerton's limitations.  (Tr. 23.)  The ALJ accorded significant weight to Dr. Ward and Dr. Reeve, and to State Agency examining physician Dr. Johnson, explaining that their opinions corroborated Dr. Wehrli's opinion and were consistent with the record evidence.  (*Id.*)  The ALJ noted that Dr. Ward released Mr. Edgerton to light duty work on March 20, 2009, six months following the surgery to remove the internal hardware in his ankle.  (Tr. 20.)  The ALJ further noted that

Dr. Reeve assessed that Mr. Edgerton was capable of sedentary work on November 29, 2010. (Tr. 23.)   The ALJ cited to Mr. Edgerton's testimony that he, in fact, returned to work in December 2008 and worked until August 2009.   (Tr. 17, 41-42.)   The ALJ indicated that Dr. Wehrli released Mr. Edgerton to sedentary work as early as September 20, 2011, three months after his subtalar fusion surgery, and that Dr. Johnson also concluded on April 7, 2012, ten months post subtalar fusion surgery, that Mr. Edgerton was capable of sedentary work. (Tr. 421, 805.)  Neither Dr. Wehrli nor Dr. Johnson restricted Mr. Edgerton to elevating his leg.

Moreover, Mr. Edgerton has failed to show how the ALJ's RFC assessment is not supported by substantial evidence.  It is not enough to point to evidence that could support an alternative finding because the Court may not reweigh the evidence.  *See Flaherty*, 515 F.3d at 1020.   In this case, Mr. Edgerton cites to three treatment records prepared by Dr. Wehrli in which he instructed Mr. Edgerton, *inter alia*, to ice and elevate his ankle/foot *as needed* for pain. (Doc. 19 at 5.)   However, substantial evidence supports the Commissioner's findings that these instructions are distinguishable from Dr. Wehrli's post-operative orders wherein he explicitly ordered Mr. Edgerton, *inter alia*, to "ice his affected extremity fifteen minutes every hour and to elevate his leg with two pillows."   (Tr. 282, 411.)   Further, as Mr. Edgerton concedes, Dr. Wehrli's instructions do not rise to the level of a functional restriction.   (Doc. 26 at 2.) Mr. Edgerton also cites to a record from a one-time visit with physical therapist Stephen Stockhausen wherein he self-reported that elevating his foot helped his pain.   (Tr. 711.) However, despite that information, Dr. Stockhausen concluded that Mr. Edgerton was qualified to work at a "light physical demand classification and that he could safely lift sixteen pounds occasionally, eight pounds frequently, and three pounds constantly." (Tr. 720.)  Dr. Stockhausen did not functionally restrict Mr. Edgerton to elevating his leg while sitting.  (Tr. 720.)   Even

assuming *arguendo* that the evidence Mr. Edgerton cited could support an alternative finding, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] findings from being supported by substantial evidence."  Here, the ALJ's RFC is supported by substantial evidence, and the evidence Mr. Edgerton's cites is insufficient to show that it is not.

Finally, the Court's examination of the record did not reveal any evidence to undercut the ALJ's findings.  *See Grogan*, 399 F.3d at 1261.  In addition to the medical record evidence the ALJ cited, the Court notes that Mr. Edgerton attended *twenty-nine* physical therapy sessions with Physical Therapy and Sports Medicine of Northern New Mexico in the six months following his subtalar fusion surgery.  (Tr. 647- 48, 650, 654-58, 660-62, 664-65, 707, 723-27, 735-39, 745, 749-51, 763, 767.)  Mr. Edgerton never indicated the need to elevate his leg, nor was he ever restricted to elevating his leg, constantly or otherwise.  To the contrary, Mr. Edgerton made steady progress, was functional with all his activities of daily living, and reported increased soreness and discomfort only with extensive walking and standing.  (*Id.*)

For all of the foregoing reasons, the ALJ's RFC is supported by substantial evidence.

**B.**     **Credibility**

As to Mr. Edgerton's testimony regarding the need to constantly elevate his leg, the Commissioner argues that the ALJ specifically considered Mr. Edgerton's testimony but found it not credible.  (Doc. 25 at 6.)  In his Reply, Mr. Edgerton argues that the ALJ failed to provide specific reasons why his testimony regarding the intensity, persistence and limiting effects of his pain was incredible.  (Doc. 26 at 4.)  Mr. Edgerton contends that his persistent efforts to obtain relief for his pain enhances his credibility.  (*Id.*)

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation omitted)).  Nevertheless, an ALJ's credibility finding "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.; see also* SSR 96-7p, 1996 WL 374186, at *2 ("it is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'").  In analyzing claims of disabling pain, the Court must consider

> (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling.

*Wilson*, 602 F.3d at 1144 (quoting *Branum v. Barnhart*, 385 F.3d 1268, 1273 (10th Cir. 2004)). When evaluating a claimant's subjective statements regarding pain, an ALJ should consider factors such as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency of compatibility of nonmedical testimony with objective medical evidence.

*Wilson*, 602 F.3d at 1145 (internal quotation omitted).

Here, the ALJ properly analyzed Mr. Edgerton's claims of disabling pain and provided specific reasons to support her credibility finding.  In making her RFC assessment, the ALJ determined that Mr. Edgerton's

medically determinable impairments could be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Tr. 20.)   As discussed above, the ALJ thoroughly discussed the record evidence, including Mr. Edgerton's testimony, to support her RFC assessment.   The ALJ specifically noted Mr. Edgerton's testimony that "[h]e applies ice and heat in rotation, and elevates his leg to waist level 'constantly'."   (Tr. 22.)   The ALJ addressed Mr. Edgerton's claims of disabling pain in pertinent part as follows:

> Dr. Wehrli wrote in September 2011 that [Mr. Edgerton] was able to bear weight as tolerated for no more than three hours a day and was restricted to lifting no more than fifteen pounds.  (Exhibit 10F/159).  By November 2011, Dr. Wehrli released [Mr. Edgerton] to light duty with no lifting and no weight bearing for longer than one-half hour (Exhibit 10F/7).  Dr. Johnson reported no limitations in his ability to perform sedentary work.  It does not appear he has had any ongoing treatment since his impairment rating in March 2012, although he has medical coverage through workers' compensation.  It is difficult to accept his allegations of disability in light of the absence of ongoing treatment.  Further, he takes no analgesic pain medication, either prescribed or over the counter, for relief of his allegedly disabling pain.   The fact that no physician has prescribed pain medications for quite some time suggests that the degree of pain experienced does not warrant such intervention and would not interfere with his ability to perform basic activities of work.  . . .

(Tr. 23.)   The ALJ additionally pointed to Mr. Edgerton's progress in physical therapy with weight bearing and walking with less support (Tr. 21), and that Dr. Johnson determined that Mr. Edgerton had no difficulty with sitting.   (Tr. 22.)   These findings are inconsistent with Mr. Edgerton's claim that he must "constantly" elevate his leg while sitting.   Thus, the ALJ's credibility finding is supported by substantial evidence and the Court will not upset her determination. *Wilson,* 602 F.3d at 1144.

C.      **Medical-Vocational Grids**

Mr. Edgerton's second argument is that the ALJ erred in relying on the Medical-Vocational Grids to find Mr. Edgerton not disabled, because the postural limitation of elevating his leg would have eroded the occupation base for sedentary work.  (Doc. 19 at 6-9.) As such, Mr. Edgerton asserts the ALJ should have obtained vocational expert testimony to determine the additional limitations on the job base.  (*Id.*)   The Commissioner argues that vocational expert testimony was not required because the ALJ did not include Mr. Edgerton's alleged need to elevate his foot as a postural limitation, and the nonexertional limitations the ALJ assessed did not substantially erode the occupational base.  (Doc. 25 at 8-9.)  The Court agrees.

The ALJ appropriately relied on the Medical-Vocational Grids as a framework to determine that Mr. Edgerton was not disabled.  The ALJ determined that Mr. Edgerton was not disabled by relying, in part, on Rule 201.28 of the Medical-Vocational grids.[16]  (Tr. 24.)  *See* SSR 85-15, 1985 WL 56857, at *1 (explaining that Medical-Vocational Guidelines provide a framework for consideration where individuals are determined not disabled based on their exertional impairments alone, but have nonexertional limitations).  Here, the ALJ assessed, and Mr. Edgerton did not dispute, that Mr. Edgerton was capable of sedentary work.[17]  (Tr. 19.)  The ALJ also assessed that Mr. Edgerton had nonexertional limitations that "he can push and pull commensurate with his ability to lift and carry," and that "he can occasionally climb ramps and stairs, and he can never climb ladders, ropes, or scaffolds."  (*Id.*)  As such, the ALJ was required

---

[16] The Medical-Vocational grids (tables) address a claimant's capability to do other work by a consideration of the factors that affect such capability, *i.e.,* RFC, age, education, and work experience.  SSR 83-11, 1983 WL 31252, at *1.  The criteria of a rule are met where an individual's RFC, age, education, and work experience coincide with the corresponding factors in the rule.  *Id.*

[17] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. §§ 416.967(a) and 404.1567(a).

to determine the sufficiency of the exertional job base based on Mr. Edgerton's nonexertional

limitations.  *See* SSR 83-14, WL 31254, at \*6; *see also Frey v. Bowen*, 816 F.2d 508, 512 (10th

Cir. 1987) (requiring a second individualized determination using the grids only as a framework

for consideration of how much the individual's work capability is further diminished in terms of

any types of jobs that would be contraindicated by nonexertional imitations).  Relying on SSR

96-9p, the ALJ explained that

> restrictions or limitations such as climbing ladders, ropes, or scaffolds would not
> usually erode the occupational base for a full range of unskilled sedentary work
> significantly because these activities are not usually required in sedentary work.
> With respect to ability to perform less than a full range of sedentary work, SSR
> 96-9p provides that if an individual is unable to lift ten pounds or occasionally lift
> and carry items like docket files, ledgers, and small tools throughout the workday,
> the unskilled sedentary occupational base will be eroded.  SSR 96-9p also
> provides that limitations or restrictions on the ability to push or pull generally
> have little effect on the unskilled sedentary occupational base.  SSR 96-9p also
> provides that the full range of sedentary work requires an individual be able to
> stand and walk for a total for approximately two hours in an eight-hour workday
> and that if an individual is able to stand and walk for slightly less than two hours,
> this by itself, would not cause the occupational base to be significantly eroded.
> Finally, SSR 96-9p provides an individual must be able to remain in a seated
> position for approximately six hours of an eight-hour workday, with a morning
> break, a lunch period, and an afternoon break at approximately two-hour intervals.
> In Mr. Edgerton's case, his limitations with respect to pushing and pulling,
> climbing ladders, ropes, or scaffolds, and climbing stairs and ramps would not
> erode the unskilled sedentary occupational base.

(Tr. 25) (citing 96-9p, WL 371185).  SSR 83-14 directs that "[w]here it is clear that the

additional [nonexertional] limitation or restriction has very little effect on the exertional

occupation base, the conclusion directed by the appropriate rule in Tables No 1, 2, or 3 would

not be affected."  SSR 83-14, WL 31254, at \*6.  Here, the ALJ properly evaluated

Mr. Edgerton's nonexertional limitations and determined they would not erode the occupational

base for full range of sedentary work.  Therefore, vocational expert testimony was not necessary.

For these reason, the ALJ did not err in relying on the Medical-Vocational grids as a framework to determine that Mr. Edgerton was not disabled.

### VI.  <u>Conclusion</u>

For the reasons stated above, Mr. Edgerton's Motion to Reverse or Remand for Rehearing is **DENIED**.

_____

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**